829 A.2d 1024

### In re TIMOTHY C.

No. 133, Sept. Term, 2000.

Court of Appeals of Maryland.

Aug. 7, 2003.

416

Margaret L. Lanier, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Zoe M. Gillen, Asst. Atty. Gen. (J. Joseph Curran, Dist. Atty., on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER CATHELL, HARRELL and BATTAGLIA, JJ.

BELL, C.J.

The questions presented by this case are three, namely, whether: where the deadline for filing a delinquency petition against a juvenile has expired, but the time for doing so has been extended without a finding of good cause, a juvenile court may make that good cause finding via a *nunc pro tunc* hearing; a 10–month delay in holding an adjudicatory hearing in a delinquency case constitutes a delay of constitutional proportions, sufficient to trigger the constitutional speedy trial

analysis; and the 10–month delay, when coupled with prosecutorial misconduct in the form of ex parte communications with the court, is sufficiently egregious to warrant dismissal of the charges in this case. The Court of Special Appeals, in an unpublished opinion answered the first question in the affirmative and the remaining two questions in the negative, thus affirming the judgment of the District Court of Maryland, sitting in Montgomery County as a Juvenile Court.[1] We shall affirm, but not for the same reasons as the intermediate appellate court.

## I.

A complaint was filed with the Department of Juvenile Justice (DJJ),[2] alleging that Timothy C., the petitioner, a student at Rock Terrace, a school for children with learning disabilities, committed acts which, if committed by an adult, would constitute a sexual offense. According to four of the petitioner's classmates, the petitioner forced one of the boys to perform fellatio, first on him, and then on a third boy, who also was an unwilling participant, while the petitioner watched. These acts, if committed by an adult, would have constituted a sexual offense in the second degree, pursuant to Md.Code (1957, 1996 Repl.Vol.) Art. 27, § 464A.[3]

The petitioner was arrested on July 8, 1998 and DJJ received the complaint against the petitioner in August, 1998. Within 30 days of receiving the complaint, it conducted an

---

1. By Acts of 2001, Ch. 414, juvenile jurisdiction was transferred from the District Court of Maryland to the Circuit Court for Montgomery County.

2. Effective July 1, 2003, the name of the Agency was changed to "the Department of Juvenile Services." See Ch. 53, Acts of 2003.

3. Md.Code (1957, 1996 Repl.Vol.) Art. 27, § 464A provides, as relevant: "(a) Elements of offense.–306–A person is guilty of a sexual offense in the second degree if the person engages in a sexual act with another person: '(1) By force or threat of force against the will and without the consent of the other person.' "
This section is now codified at Md.Code (2002) § 3–306 of the Criminal Law Article. See Acts of 2002, Ch. 26, § 2.

investigation. Because the intake officer recommended informal adjustment, in the "Best Interest of Youth/Community"[4] and the offense would have been a felony if committed by an adult, DJJ referred the matter to the State's Attorney, who received the referral on September 23, 1998. Within 30 days of his receipt of the referral, or on October 21, 1998, the State's Attorney filed a Motion For Appropriate Relief (To Extend Time For Filing Petition), in which he requested the juvenile court to extend the deadline for filing charges for an additional 60 days. The certificate of service attached to the motion indicated that only DJJ had been mailed a copy of the motion. Three reasons were given for why the extension of time was needed:

"1. That Respondent is charged with a sex offense.

"2. That Respondent has a prior assault charged involving the same victim.[5]

"3. That according to the Department of Juvenile Justice Authorization the victim's father has reservations about pursuing this matter."[6]

On the same day the motion was filed, the juvenile court, apparently without a hearing, granted it, thus giving the State an additional 60 days in which to file a delinquency petition. Thereafter, within the 60 day period, the State filed a delinquency petition against the petitioner.

---

**4.** The intake officer commented in this regard:
> "The worker spoke to the father of the victim and he said this was not a court matter but, a mental health issue. Both the respondent and the victim are mentally challenged."

**5.** This allegation was later disproved. There was no prior assault charge involving the same victim.

**6.** The authorization/referral received from the Department of Juvenile Justice on September 23, 1998 indicated that the victim did not want to pursue the matter in court. The counselor for the Department testified that she checked the "No" box next to the preprinted question, "Does Victim Want Court?" because the victim's father told her that "he did not necessarily want to go to court, but that he did not want this to happen again. He feels that it is a mental health issue and not a delinquency issue." The counselor also testified that her original recommendation was for informal supervision.

The petitioner moved to strike the delinquency petition as untimely filed. He also moved to dismiss the petition on constitutional speedy trial grounds. Finally, the petitioner sought dismissal of the petition as a result of the delay in setting the adjudicatory hearing.

At a hearing on Petitioner's Motion to Strike the Extension of Time, he argued that notice is required to be given to an opposing party and that, because no such notice was provided, the granting of the State's motion violated due process and the Maryland Rules. The juvenile court agreed with the petitioner that the order granting the State's motion to extend the time for filing the delinquency petition was flawed, and that the failure to serve the petitioner resulted in a violation of Maryland Rule 1–351. Rather than strike the order as the petitioner urged, however, the court held a hearing on the motion for extension of time *nunc pro tunc*. At the conclusion of that hearing, the court ruled that there was good cause for the extension of time. Consequently, it denied the petitioner's motion to strike.

Noting that the time elapsed from arrest to the adjudicatory hearing was just over fourteen (14) months and that none of that delay was attributed to him, the petitioner, on the morning of the adjudicatory hearing, argued that the petition should be dismissed for violation of his constitutional right to a speedy trial. Having conducted the analysis of the factors, as required by *Berryman v. State,* 94 Md.App. 414, 420, 617 A.2d 1120, 1123, *cert. denied,* 331 Md. 86, 626 A.2d 370 (1993), the court denied the motion.

The petitioner's motion to dismiss for the untimeliness of the adjudicatory hearing was premised on there being a delay of more than ten (10) months between his being charged and the petition being adjudicated, while the applicable rule, Md. Rule 11–114 prescribes that the adjudicatory hearing be set within sixty (60) days. Acknowledging that dismissal is not lightly to be ordered, the petitioner argued that the circumstances surrounding the delay, *i.e.* the length of delay from charging to adjudication and the *ex parte* communications that

occurred between the prosecutor and the court during a postponement hearing, were so egregious as to make dismissal the only appropriate disposition. The court was not convinced and, so, denied that motion, as well.

The petitioner noted an appeal to the Court of Special Appeals, challenging each of the aforementioned rulings of the juvenile court. The intermediate appellate court affirmed the judgment of the juvenile court, finding merit in none of the issues the petitioner raised. As to the motion to dismiss the petition as untimely filed, the court endorsed the *nunc pro tunc* hearing procedure the juvenile court followed in resolving what the Court of Special Appeals described as a "technical violation of the Rules." It opined:

> "Rather than dismissing the petition based on such a violation, however, the trial court conducted a hearing *nunc pro tunc* to determine whether or not good cause for the extension existed at the time it was granted. After hearing testimony from both the State and the [petitioner] regarding the circumstances surrounding the extension, the trial court found that good cause for the extension had, in fact, existed. As a result, the trial court denied the [petitioner] any additional relief. We see no error in that determination."

The court also was of the view that the petitioner failed to demonstrate actual prejudice, as he was required, by Md.Code (1974,1998 Repl.Vol., 1999 Cum.Supp.) § 3–810(q) of the Courts and Judicial Proceedings Article,[7] to do.

Assuming that the right to speedy trial applied to juvenile proceedings, the intermediate appellate court concluded that there was, in this case, no speedy trial violation. Purporting to count from the date of arrest to date of adjudication, but in

---

7. Md.Code (1974,1998 Repl.Vol., 1999 Cum.Supp.) § 3–810(q) of the Courts and Judicial Proceedings Article provides:

"The court may dismiss a petition for failure to comply with this section only if the respondent has demonstrated actual prejudice."

Unless otherwise indicated, all statutory citations herein are to Md. Code (1974, 1998 Repl. Vol, 1999 Cum.Supp.) of the Courts and Judicial Proceedings Article.

fact counting only from the date the delinquency petition was filed, the court determined that only ten (10) months elapsed. That length of delay, the court held, "is not an inordinate delay within constitutional contemplation." For that reason, the Court of Special Appeals did not conduct the analysis of the speedy trial factors enumerated in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 115 (1972), ending its analysis with this threshold determination.

Finally, the Court of Special Appeals rejected the petitioner's argument that dismissal of the petition was required because it had not been adjudicated within the sixty (60) days required by Rule 11–114. Specifically, the court was unconvinced that the circumstances surrounding the delay in the case were so extraordinary or egregious as to require dismissal under *In Re Keith W.*, 310 Md. 99, 109, 527 A.2d 35, 40 (1987).

The petitioner filed in this Court a petition for writ of certiorari, which we granted. *In re Timothy C.*, 362 Md. 623, 766 A.2d 147 (2001). As indicated, we shall affirm the judgment of the intermediate appellate court, although not on the same grounds.

## II.

The petitioner argues that the "Maryland Rules, the text of the Juvenile Causes Act, and the case law under the act all compel the conclusion that when the State litigates a motion to extend the deadline for charging, the State must serve notice on the child." Pointing out that § 3–812(c) requires that the procedures to be followed by the court, shall be as specified in the Maryland Rules, he submits that failure to serve notice on the child is a violation of both Maryland Rule 1–204 (Motion to shorten or extend time requirements) [8] and 1–351 (Order upon

---

8. Maryland. Rule 1–204, in pertinent part, provides:

 "(b) *Ex parte order.* The court may enter *ex parte* an order as provided in subsections (a)(1) and (a)(2) of this Rule only if the motion sets forth (1) facts which satisfy the court that the moving party attempted but was unable to reach agreement with the oppos-

ex parte application prohibited—Exceptions),[9] both of which prohibit, except under limited circumstances not here implicated, *ex parte* orders. Therefore, relying on *In re Anthony R.*, 362 Md. 51, 66, 763 A.2d 136, 145 (2000) (holding that the thirty (30) day time limit for charging is mandatory and dismissal is the sanction), the petitioner concludes:

> "Since the filing of the State's motion to extend the deadline was flawed in such a fundamental way, it was a nullity. Since the motion was a nullity, it cannot be said to have been filed within the relevant 30–day period. Since the request for the extension of the deadline was not filed before the 30–day period expired, it was not timely, and the order granting it was fundamentally flawed. Without a valid extension, the State is required to charge within 30 days. Since the charge was not filed within 30 days, the petition must be dismissed."

Relying on *In re Steven B.*, 84 Md.App. 1, 9–10, 578 A.2d 223, 227–28, *cert. denied*, 321 Md. 385, 582 A.2d 1256 (1990), *State v. Patrick A.*, 312 Md. 482, 492–93, 540 A.2d 810, 814–815 (1988), and *Calhoun v. State*, 299 Md. 1, 9, 472 A.2d 436, 440 (1984), the petitioner adds, "a *nunc pro tunc*, after-the-fact

---

ing party and that the moving party notified or attempted to notify the opposing party of the time and place the moving party intends to confer with the court; or (2) facts which satisfy the court that the moving party would be prejudiced if required to comply with the requirements of subsection (b)(1) of this Rule.

"(c) Service of Order. An order which shortens the time for responding to original process may be served in the same manner as the original process. Other orders entered under this rule shall be served in the manner provided by Rule 1–321."

9. Maryland Rule 1–351 provides:

*"Order upon ex parte application prohibited-Exceptions.* No court shall sign any order or grant relief in an action upon an *ex parte* application unless:

"(a) an *ex parte* application is expressly provided for or necessarily implied by these rules or other law, or

"(b) the moving party has certified in writing that all parties who will be affected have been given notice of the time and place of presentation of the application to the court or that specified efforts commensurate with the circumstances have been made to give notice."

determination does not comply with the requirements of timing statutes."

The petitioner acknowledges, as he must, that when the extension of time for filing the delinquency petition was sought, self-evidently, he had not yet been charged, the delinquency court proceedings had not yet commenced. No matter, he maintains, arguing that "[a] juvenile delinquency case, unlike an adult criminal case, does not begin with charging." For that proposition, he cites § 3–810(a)–(k) and, in particular, § 3–810(e). The petitioner also proffers that "[t]he case between DJJ (a department of the State) and Timothy was already joined, shortly after DJJ became involved," offering as proof the fact that the petitioner had been attending counseling arranged by DJJ since the locker room incident became the subject of complaint. In addition, he points to the court's involvement in the extension of time process. In that regard, he asserts:

"The fact that the legislature involved the court in the process of extending the deadline strongly suggests that the adversarial system is implicated. In our system of justice, the court acts as referee between two competing parties; in Maryland, the court does not exist to 'rubber stamp' the State. If the legislature intended that the State hold all the cards and make all the decisions in regard to extending the time limit for charging, there would be no need to go to the court for an extension; the legislature could have simply allowed the State to grant its own extension, if the State believed there was good cause."

The State counters that service on the petitioner was not required because, when the extension of time was sought, the delinquency petition had not yet been filed; thus, "Timothy C. was not yet a party." Moreover, the State argues, "the 'opposing party' in this context was not Timothy C., but rather the Department of Juvenile Justice, which had recommended informal adjustment [and which] was, in fact, appropriately served with the State's motion." If service were required to be made on the petitioner, the State nevertheless continues of the belief that dismissal of the petition was not compelled. In

its view a *nunc pro tunc,* after the fact determination of the existence of good cause for the extension of time, "under the circumstances of this case ... was entirely proper." The State reasons:

"... [I]n its recent decision of *In re Anthony R.,* this Court concluded that dismissal with prejudice is required when the State 'fails to file a delinquency petition within thirty days of receiving a referral from an intake officer unless, within the thirty-day period, the State's Attorney receives an extension for good cause shown from a court.' 362 Md. at 66[, 763 A.2d at 145]. However, in *In re Anthony R.,* this Court was addressing a situation in which no effort was made to obtain an extension within the original thirty day period. *See id.* at 54–54[, 763 A.2d at 138–39]. Here, by contrast, the motion was both timely filed and timely granted within the thirty days. Thus, even assuming *arguendo* that the order was rendered invalid by a lack of service, dismissal is not mandated."

Underlying the petitioner's argument, and, indeed, the juvenile court's ruling and handling of the issue of the timeliness of the filing of the delinquency petition, is the accuracy of the court's determination that the motion to extend the time required that the petitioner be a party to that proceeding and, therefore, needed to be served with the motion before the court legally could consider the matter. It was that ruling that made the *nunc pro tunc* hearing necessary and, ultimately, this Court's determination to review that issue. As a threshold matter, therefore, we consider the propriety of that ruling.

To do so, we must review the statutory scheme governing the filing of delinquency petitions. That scheme consists of pertinent sections of § 3–810 and § 3–812. Section 3–810(a) designates the DJJ intake officer as the person to receive "complaints from a person or an agency having knowledge of facts which may cause a person to be subject to the jurisdiction of the [juvenile] court." Having received such a complaint, § 3–810(c)(1) provides that the intake officer has twen-

ty-five (25) days to inquire into the court's jurisdiction over the complaint and "whether judicial action is in the best interests of the public or the child." Having conducted the inquiry, the intake officer, within the twenty-five (25) day period, "may . . .:

"(i) Authorize the filing of a petition;

"(ii) Propose an informal adjustment of the matter; or

"(iii) Refuse authorization to file a petition."

If a complaint alleges the commission of a delinquent act which would be a felony if committed by an adult, and if the intake officer denies authorization to file a petition or proposes informal adjustment, then the intake officer "shall immediately" forward the complaint and the "entire intake case file" to the State's Attorney. § 3–810(c)(4)(i). Section 3–810(c)(4)(ii) gives the State's Attorney thirty (30) days after receipt of the complaint, "unless the court extends the time," to "make a preliminary review as to whether the court has jurisdiction and whether judicial action is in the best interests of the public or the child," and decide which of three options—file a petition, refer the complaint to DJJ for informal disposition or dismiss the complaint—to take. See also § 3–812(b), which provides, as relevant:

"Petitions alleging delinquency or violation of § 3–831 shall be prepared and filed by the State's Attorney. A petition alleging delinquency shall be filed within 30 days after receipt of a referral from the intake officer, unless that time is extended by the court for good cause shown. . . ."

■ As indicated, when the State sought the extension of time, a delinquency petition, an "original pleading," see Maryland Rule 1–202(q) ("the first pleading filed in an action against a defendant"), had not been filed. Indeed, the purpose of the application to the court was to delay just such a filing. The filing of the delinquency petition signals the initiation of judicial action. Section 3–810(c)(1) requires the intake officer to determine the court's jurisdiction and "whether judicial action is in the best interest of the public or the child." Section 3–810(c)(3), on the other hand, permits the

intake officer to recommend, *inter alia,* the filing of a petition or an informal adjustment. *See also* § 3–810(e), which permits the intake officer to propose informal adjustment upon concluding from the complaint and inquiry "that an informal adjustment, rather than judicial action, is in the best interests of the public and the child." In this case, the intake officer had recommended informal adjustment, a disposition different from and, in fact, an alternative to judicial action.

Maryland Rule 1–321(a) addresses the service of pleadings and papers other than original pleadings. It provides:

"(a) Generally. Except as otherwise provided in these rules or by order of court, every pleading and other paper filed after the original pleading shall be served upon each of the parties. If service is required or permitted to be made upon a party represented by an attorney, service shall be made upon the attorney unless service upon the party is ordered by the court. Service upon the attorney or upon a party shall be made by delivery of a copy or by mailing it to the address most recently stated in a pleading or paper filed by the attorney or party, or if not stated, to the last known address. Delivery of a copy within this Rule means: handing it to the attorney or to the party; or leaving it at the office of the person to be served with an individual in charge; or, if there is no one in charge, leaving it in a conspicuous place in the office; or, if the office is closed or the person to be served has no office, leaving it at the dwelling house or usual place of abode of that person with some individual of suitable age and discretion who is residing there. Service by mail is complete upon mailing."

A "party,"as defined by § 3–801(r), includes "a child who is the subject of a petition or a peace order request, the child's parent, guardian, or custodian, the petitioner and an adult who is charged under § 3–831 of this subtitle." Until the petition was filed, there was no judicial proceeding to which the petitioner was, or could be, a party. And until the petition was filed, there being no obligation to serve the petitioner because he was not a party at that time, there could be no *ex parte* order in the circumstance in which the State seeks to

extend the time for filing the very pleading that would initiate judicial action. Indeed, it may be argued that, by virtue of the posture of the proceedings, at the very least, *ex parte* action was contemplated, or necessarily implied, by Rule 1–351.

The petitioner also argues that the State's obtaining of the time extension without serving him violated Maryland Rule 1–204, as well. That Rule permits the court to extend or shorten the time for doing an act required by "these rules or an order of court," if the motion to do so is filed within the period prescribed for doing the act, Rule 1–204(a). It proscribes the entry of *ex parte* orders for those purposes, however, except upon a showing of an attempt to reach agreement, notice, or attempted notice, of the time and place where the court will be consulted and of facts that the moving party would be prejudiced in the absence of an *ex parte* order. As the State points out, "[Rule 1–204], by its plain language is ... applicable only '[w]hen these rules or an order of court require or allow an act to be done at or within a specified time ...,'" a requirement lacking in this case since the time requirement at issue in this case "is imposed by statute; specifically, by Sections 3–810(c)(4)(ii) and 3–812(b)...." It is additionally pertinent that, as already indicated, when the extension of time was sought, no court action had been initiated and, therefore, there simply was no "opposing party," unless it were DJJ, on whom service was made, with whom to consult in an attempt to reach agreement or to whom notice needed to be given.

Nor are we persuaded that the involvement of the court in the process of extending the time for filing a delinquency petition necessarily suggests the implication of the adversarial system. The statute, § 3–812(b), requires the State's Attorney to show good cause to obtain extension of time to file a petition. It does not require that there be, and the court's ability to determine whether there has been the requisite showing does not depend upon there being, an adversarial hearing. In this case, the State's Attorney offered a reason for requesting the extension of time—the need for

further investigation. The justification for that reason, contained in the motion to extend time and the DJJ referral—the nature of the offense, the disposition recommended by the intake officer, and the fact that the father of the victim had expressed reservations about judicial action—could have been, and obviously was, found to be good cause. To be sure, had the petitioner been a party, required to be served, his exclusion and the fact that he might have been able to persuade the court that an extension was not required, that the reasons offered were not sufficient cause, are matters that we would, and should, consider. That, however, is not the situation we have here.

■ We hold that, because the State was not required to serve the petition on Timothy C. when it filed its motion to extend the time for filing a delinquency petition, the juvenile court did not err in denying the petitioner's motion to strike the delinquency petition. Therefore, we need not, and do not, address the propriety of the *nunc pro tunc*, after the fact hearing.[10]

---

**10.** Nonetheless, we think it important to recall the meaning of the phrase, *"nunc pro tunc,"* and the office of the *"nunc pro tunc* order." According to Black's Law Dictionary (5th ed.1979) at page 964, the phrase means:

> "Lat. Now for then. A phrase applied to acts allowed to be done after the time they should be done, with a retroactive effect, i.e., with the same effect as if regularly done. *Nunc pro tunc* entry is an entry made now of something actually previously done to have effect of former date; office being not to supply omitted action, but to supply omission in record of action really had but omitted through inadvertence or mistake.
>
> *"Nunc pro tunc* merely describes inherent power of court to make its records speak the truth, i.e., to record that which is actually but is not recorded.... *Nunc pro tunc* signifies now for then, or, in other words, a thing is done now, which shall have the same legal force and effect as if done at time when ought to have been done...."

Maryland law is in accord. In *Maryland, Delaware & Virginia R. Co. v. Johnson,* 129 Md. 412, 416–17, 99 A. 600, 601 (1916), although never using the phrase, *nunc pro tunc,* the Court observed:

> "To make the record speak the truth and conform to the facts is a common law power, and is incident to all courts of record, and essential to their efficient existence. This power may be exercised at any time, even if the Record has been transmitted on appeal to a

Note 10—Continued

superior court and the appeal is there pending.... But in the exercise of such power the Court is authorized to make only such corrections as will make the record conform to the actual facts occurring in the progress of the cause, or, in other words, make the Record speak the truth. It cannot so change the Record as to make it inconsistent with the facts, or make it state what is not true." (Citations omitted)

*See Greff v. Fickey*, 30 Md. 75, 77 (1869) ("If (the judge) [is] satisfied either from his own knowledge of what had actually occurred in the progress of the cause, or from evidence adduced, that the docket entries made by the clerk were erroneous and incomplete, it was within his power, and his plain duty, to have them corrected, so that a full, true and perfect transcript of the whole proceedings as they actually occurred in the progress of the cause might be sent up in obedience to the writ").

The Court of Special Appeals, consistent with the view of our sister States, see *McPherson v. State*, 187 Ark. 872, 63 S.W.2d 282 (1933); *Careaga v. Careaga*, 61 Cal.2d 471, 39 Cal.Rptr. 215, 393 P.2d 415, 417 (Ca.1964); *In the Interest of H.L.W.*, 244 Ga.App. 498, 535 S.E.2d 834, 835–36 (2000); *Pirtle v. Cook*, 956 S.W.2d 235, 240–42 (Mo.1997); *Interstate Printing Company v. Department of Revenue*, 236 Neb. 110, 459 N.W.2d 519, 522–23 (1990); *Finley v. Finley*, 65 Nev. 113, 189 P.2d 334, 336 (1948); *Helle v. Public Utilities Commission*, 118 Ohio St. 434, 161 N.E. 282, 283–84 (1928); *Andrews v. Koch*, 702 S.W.2d 584, 585 (Tex.1986); *Preece v. Preece*, 682 P.2d 298, 299 (Utah 1984); *Council v. Commonwealth*, 198 Va. 288, 292, 94 S.E.2d 245, 248 (1956); *Bostwick v. Van Vleck*, 106 Wis. 387, 82 N.W. 302, 303 (1900), has said that "the purpose of a *nunc pro tunc* entry is to correct a clerical error or omission as opposed to a judicial error or omission." *Prince George's Co. v. Commonwealth Land Title*, 47 Md.App. 380, 386, 423 A.2d 270, 274 (1980). *See Forward v. McNeily*, 148 Md.App. 290, 312, 811 A.2d 855, 868 (2002). In *Helle*, 161 N.E. at 284 quoting *Cleveland Leader Printing Co. v. Green*, 52 Ohio St. 487, 40 N.E. 201, (1895), the Ohio Supreme Court pointed out:

"The province of a *nunc pro tunc* entry is to correct the record of the court in a cause so as to make it set forth an act of the court, which though actually done at a former term thereof, was not entered upon the journal; and it cannot lawfully be employed to amend the record so as to make it show that some act was done at a former term, *which might or should have been,* but was not, then performed."

*Bostwick* 82 N.W. at 303, enunciated a test to be applied:

"The test to be applied in determining whether an error in a judgment is of a judicial character, or a mere clerical mistake which may be corrected in the court where it was made at any time, saving intervening rights of third parties and with due regard to equitable considerations, is whether the error relates to something that the trial court erroneously omitted to pass upon or considered and passed upon erroneously, or a mere omission to preserve of record, correctly in all respects, the actual decision of the court, which in itself was free from error. If the difficulty is found to be of the latter character, it may be remedied as a mere clerical mistake, which will not have

### III.

In *In re Thomas J.*, 372 Md. 50, 70, 811 A.2d 310, 322 (2002), this Court held that, "as a matter of fundamental fairness ..., the Due Process Clause of the Fourteenth Amendment and Article 21 of the Maryland Declaration of Rights require that juveniles be afforded a speedy trial." As we have done in criminal prosecutions and, consistent with our sister jurisdictions that have expanded the speedy trial right to juveniles, we adopted the four part test enunciated in *Barker v. Wingo*, 407 U.S. 514, 530–32, 92 S.Ct. 2182, 2192–93, 33 L.Ed.2d 101, 115–117 (1972), to determine whether the juvenile in that case had been denied his constitutional right to a speedy trial. *Id.* at 72, 811 A.2d at 323. "The factors identified to be considered are: (1) the length of delay; (2) the reason for the delay; (3) the assertion of the right to a speedy trial by the accused; and (4) the prejudice to the accused resulting from the delay." *Thomas J.*, 372 Md. at 72, 811 A.2d at 323, citing *Barker v. Wingo*, 407 U.S. at 530–32, 92 S.Ct. at 2192–93, 33 L.Ed.2d at 117–18; *Divver v. State*, 356 Md. 379, 388, 739 A.2d 71, 76 (1999). Therefore, this aspect of the speedy trial question the petitioner presented has been answered favorably to him. This leaves to be resolved whether the delay from arrest to adjudication was of constitutional magnitude, as the petitioner also maintains.

Addressing that question, we note, preliminarily, that, although the juvenile court conducted a *Barker v. Wingo* weighing analysis, the Court of Special Appeals did not, having declined to do so. It determined, instead, that the relevant delay, which it calculated, erroneously, to be ten (10) months, rather than the fourteen and a half (14½) months it actually was, did not reach the constitutional threshold—that it was not sufficiently inordinate. The intermediate appellate court was wrong on both points.[11] Our cases teach that a

---

Note 10—Continued
the effect to change the judgment pronounced in the slightest degree, but merely to correct the record evidence of such judgment."

11. The petitioner makes the argument that less delay is required in the juvenile context than in the adult context. He points to, and contrasts

delay of fourteen (14) months and fifteen (15) days is of constitutional proportion. *See Divver v. State,* 356 Md. at 389–90, 739 A.2d at 76–77, surveying our speedy trial cases to determine the threshold at which the *Barker v. Wingo* weighing is triggered. Noting that delays between arrest and trial of less than a year had been determined to be sufficiently inordinate to trigger the *Barker v. Wingo* analysis, we held, albeit in an adult context, that a delay of twelve (12) months and sixteen (16) days in the trial of a relatively uncomplicated District Court case was of constitutional proportion, *i.e.* it was sufficiently "presumptively prejudicial" as to make necessary an inquiry into the other factors that go into the *Barker v. Wingo* balance. *State v. Henson,* 335 Md. 326, 333, 643 A.2d 432, 435 (1994). It follows that the Court of Special Appeals was required to, and should have, weighed the *Barker v. Wingo* factors.

 Ordinarily, we would remand the case to the intermediate appellate court to conduct the weighing. Under the circumstances of this case, as was the case in *Divver,* 356 Md. at 394, 739 A.2d at 79, that is unnecessary. The juvenile court, unlike in *Divver,* where neither the District Court nor the Circuit Court did the weighing, weighed the *Barker v. Wingo* factors. Moreover, the essential facts are largely undisputed. Therefore, we are able to perform our independent constitutional review on the record we have.

 As we have seen, the length of the delay was sufficiently presumptively prejudicial to trigger the weighing. Closely related to the length of the delay is the reason for the

---

the difference in the statutes and rules prescribing when an adult criminal trial and a juvenile proceeding must be commenced, 180 days in the case of the former, see Maryland Code (1957, 1996 Repl.Vol. Article 27, § 591 now Maryland Code (2002) § 6–103 of the Criminal Procedure Article) and Maryland Rule 4–271, and 60 days in the case of the latter, see Maryland Rule 11–114. There is a suggestion to that effect in *In re Thomas J.,* 372 Md. 50, 75–76, 811 A.2d 310, 325 (2002). We need not decide this issue since the length of the delay in this case is of constitutional magnitude, even for an adult criminal trial. See *Divver v. State,* 356 Md. 379, 389–90, 739 A.2d 71, 76–77 (1999).

delay. Different reasons will generate different weights. As we explained in *State v. Bailey*, 319 Md. 392, 412, 572 A.2d 544, 553 (1990),

> "[A] continuum exists whereby a deliberate attempt to hamper the defense would be weighed most heavily against the State, a prolongation due to negligence of the State would be weighed less heavily against it, a delay caused by a missing witness might be a neutral reason chargeable to neither party, and a delay attributable solely to the defendant himself would not be used to support the conclusion that he was denied a speedy trial."

quoting *Jones v. State*, 279 Md. 1, 6–7, 367 A.2d 1, 5–6 (1976).

In this case, the trial court determined that the reason for each delay, and the delay as a whole, was neutral, attributable to neither the State nor the petitioner. It reasoned:

> "Reasons for the delay, I believe [sic] have already been made a matter of record, there was … a lot of concern in DJJ regarding whether or not this was a case in which the victim and his family would cooperate with the, with a prosecution of the case and then, further investigation along the same lines, in the State's Attorney's office, once the matter was, was petitioned and that it did get petitioned within ninety days or so of the case being referred to DJJ. And I find that there was no … that those reasons, to the point of filing the petition, were, were legitimate ones, and, perfectly suitable, given the sensitive nature of the case.

> "We've already gone over the situation involving the time from the filing of the petition, until the May 27 trial date,…. I find that those reasons, having to do with calendaring of cases, were satisfactory, and basically from May 27 on, we've been, we in the sense of the Court and the State's Attorney's Office certainly have been trying to get this case to trial. We still haven't succeeded in it yet."

As we have seen, the petitioner asserted his right to a speedy trial on February 24, 1999. The juvenile court, accordingly, weighed this factor in the petitioner's favor.

With respect to the last factor, the prejudice to the petitioner, three interests have been identified as bearing on this factor: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Thomas J.*, 372 Md. at 77, 811 A.2d at 326, citing *Barker v. Wingo*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. The first interest, the juvenile court concluded, was not implicated in this case, while the second favored the petitioner. With respect to the third interest, it did not believe that it had been shown, reasoning that "the mere assertion that children who may be emotionally disturbed or have other problems, have specific memory impairments, any greater than the rest of the general population.... [I]t's been proffered by [defense counsel], but without anything on earth to support it." The juvenile court struck the balance in favor of the State and denied the petitioner's speedy trial motion.

We do not believe that the reasons for the delay factor should be weighed, overall, as neutral. Clearly, the delay attributable to the inquiry preliminary to filing the delinquency petition is properly weighed as neutral; however, the delay following the filing of the petition is attributable to, and weighed against, the State, although not heavily so. That said, we hold that the juvenile court, under the circumstances, struck the proper balance. There was no error in the denial of the motion to dismiss for denial of a speedy trial.

## IV.

Maryland Rule 11–114 requires that an adjudicatory hearing be held within sixty (60) days of service on the respondent of a juvenile petition. We have held, however, that "only the most extraordinary and egregious circumstances should be allowed to dictate dismissal as the sanction for this violation of a procedural rule." *In re Keith W.*, 310 Md. 99, 109, 527 A.2d 35, 40 (1987). *See In re Keith G.*, 325 Md. 538, 548, 601 A.2d 1107, 1112 (1992). This so, we said, because the overriding purpose of the juvenile statute "will ordinarily not be served

by dismissal of the juvenile proceeding." *In re Keith W.,* 310 Md. at 109, 527 A.2d at 40.[12]

Aware of this position, the petitioner argues that this case is characterized by egregious circumstances sufficient to justify dismissal, namely the delay between the filing of the petition and the adjudication hearing, just over ten (10) months, and *ex parte* communications between prosecutor and the court. With regard to the latter, the petitioner relies on the petition by the State to extend time for filing the petition as one such *ex parte* hearing. The second, it proffers, occurred when a prosecutor communicated with the court during a postponement hearing, when the petitioner's counsel was not present, which resulted in the rescheduling of the hearing for an adjudication with no witnesses. We are not persuaded.

We have already determined that the petition to extend time was not a prohibited *ex parte* communication, that such communication was contemplated and the petition to extend time did not require notice to the petitioner. Consequently, that circumstance does not demonstrate egregiousness. As to the *ex parte* communication during the postponement hearing, addressing its egregiousness, the juvenile court said:

"[I]n an absolutely, positively perfect world maybe [some things] could have been done differently, but I don't think that ... with all the parties acting in good faith, which I do find that they were. Again, there's not a hint of anything that [the State] said to the Court on January 20th ... that said he was acting with the voice of [petitioner's counsel]. I mean, he couldn't have been clearer that he wasn't. The Court essentially made an honest ... assumption that may not have ... that in fact was not correct. But again was that egregious? I don't find in any way, shape or form that it was egregious."

---

12. The petitioner argues that the overriding purpose of the Juvenile Causes Act has changed since the decision in *In re Keith W.,* 310 Md. 99, 527 A.2d 35 (1987), from rehabilitation to a "greater focus on public safety and accountability, i.e., the purposes have become more punitive, and now resemble the criminal law more closely."

**436**

■■■■■■■■■

Moreover, the continuances that were granted were supported by good cause. To be sure, the circumstances of this case are somewhat peculiar. They are not so extraordinary or egregious as to justify dismissal of the delinquency petition, however.

JUDGMENT AFFIRMED, WITH COSTS.